BRIAN J. PAUL (*pro hac vice* pending)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46024-1750
Telephone: (317)-237-0300
Facsimile: (317)-237-1100
Email: brian.paul@FaegreBD.com

JOSHUA N. TURNER (*pro hac vice* pending)
FAEGRE BAKER DANIELS LLP
90 S. Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7738
Facsimile: (612) 766-1600
Email: joshua.turner@FaegreBD.com

LUCAS J. TOMSICH Cal. Bar No. 295685
FAEGRE BAKER DANIELS LLP
1950 UNIVERSITY AVE, Suite 450
East Palo Alto, CA 94303-2279
Telephone: 650.324.6700
Facsimile:  650.324.6701
Email: lucas.tomsich@FaegreBD.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TECHNICOLOR SA,<br><br>Plaintiff,<br><br>v.<br><br>DOLBY LABORATORIES LICENSING CORP. and DOLBY INTERNATIONAL AB,<br><br>Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Technicolor SA ("Technicolor" or "Plaintiff"), for its complaint against Dolby Laboratories Licensing Corporation and Dolby International AB (collectively, "Dolby" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. Technicolor contracted and paid for the right to use certain Dolby intellectual property and trademarks (the "Licensed Technology") in its products, such as set-top boxes.

Relevant to the current dispute, Technicolor's use of the Licensed Technology is governed by the 2007 Agreement Regarding Standard Terms and Conditions (System) (the "2007 Agreement") and the 2015 System License Agreement and associated addenda (the "2015 Agreement"), collectively, the "License Agreements." Exs. 1 & 2.

2. **Dolby is now threatening to terminate "any and all" agreements with Technicolor on *Tuesday, September 10, 2019*,** that is, unless Technicolor pays Dolby royalties that it does not owe. Ex. 3. Indeed, Dolby has already interfered with Technicolor's operations by withholding licenses, while it has attempted to extract these additional royalties from Technicolor. Ex. 10 at ¶ 17.

3. To make matters worse, Technicolor has no viable back-up option because all digital television broadcasts in the United States, Canada, and many other countries use Dolby Digital, one of the key Licensed Technologies at issue here. Ex. 4; Ex. 8 at ¶. Dolby Digital is *the* standard in the industry, and Dolby knows this, a fact it proudly touts on its website. Ex. 4. It is thus using its dominant market position in an attempt to force Technicolor to capitulate to its position, as Technicolor's entire set-top box business hangs in the balance.

4. Dolby's unlawful actions were precipitated by an audit of Technicolor's books and records, which Dolby claims shows that Technicolor underpaid royalties. Technicolor reviewed the audit results, determined it had underpaid royalties on some products and overpaid royalties on others, and promptly paid just over $2.1M to Dolby in July of 2019. Dolby, for several weeks, suspended Technicolor's rights under the License Agreements, interfering with Technicolor's business operations in the meantime, and demanded further royalties on certain Dolby technologies that are not used on Technicolor's set-top boxes. Ex. 10 at ¶ 17. Technicolor, at its own expense, completed technical analyses of the set-top boxes, and even tested sample set-top boxes, all of which showed the set-top boxes were incapable of performing certain Dolby technology. Ex. 5 at ¶¶ 7-26. Dolby has ignored this analysis and testing.

5. Technicolor has worked with Dolby in good faith to resolve the dispute, but Dolby has only flexed its leverage more. Technicolor has already paid Dolby $45.7 million during the audit period, on every product that performs Dolby technology, and then paid another $2.1 million

2

this July to address discrepancies in the audit. Dolby has now given Technicolor an ultimatum: either pay an additional $8 million in royalties for Dolby technology that Technicolor's products do not perform, or suffer termination of its agreements with Dolby. Ex. 3.

6. If Dolby is permitted carry out its threat, it would make it impossible for Technicolor to manufacture set-top boxes for its customers, which means that Technicolor would be unable to fulfill its contracts with its customers and irreparably lose market position to its competitors—all because of a dispute in which even Dolby's auditor found that the correct royalties were paid for more than 75% of the set-top boxes sold during the audit period. Technicolor therefore urgently needs this Court to enjoin Dolby from terminating the License Agreements, or it will suffer irreparable harm to its reputation and market share in the competitive set-top box market.

7. Accordingly, Technicolor seeks: (1) a judicial declaration that Dolby has breached its contractual obligations under the License Agreements and tortuously interfered with the performance of Technicolor's contracts with service providers to manufacture set-top boxes; (2) a temporary restraining order and preliminary and permanent injunction against Dolby's termination of Technicolor's right to use the Licensed Technology; and (3) a judicial determination of compensation for Dolby's breach.

**NOTICE**

8. Shortly following the filing of this complaint, Technicolor emailed a copy of this complaint and motion for temporary restraining order to Leo Spooner, an attorney at Dolby.

9. Mr. Spooner has been the lead spokesperson for Dolby regarding the issues relating to the audit that has led to this dispute.

10. Technicolor is also in the process of formally serving both Dolby defendants.

**THE PARTIES**

11. Plaintiff Technicolor is incorporated in and has its principal place of business in Paris, France. For over 30 years, Technicolor has been at the forefront of innovation for the entertainment industry, providing production services for feature films and television shows, as well as inventing technologies used in broadband and video products throughout the world. Technicolor

provides a suite of services and products for the entertainment industry, including many products for service providers, such as set-top boxes.

12. Defendant Dolby Laboratories Licensing Corporation is incorporated in New York and has its principal place of business in San Francisco, California.

13. Dolby International AB is incorporated in Sweden and has its principal place of business in Amsterdam, the Netherlands.

14. Both Dolby Laboratories Licensing Corporation and Dolby International AB are signatories to the License Agreements.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendants, and because the amount in controversy is in excess of $75,000, exclusive of interest and costs.

16. Dolby is subject to this Court's personal jurisdiction consistent with the principles of due process, because Defendants maintain offices and/or facilities in the Northern District of California, offer products for sale in the Northern District of California, and/or have transacted business with Technicolor in this District.

17. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c). Venue is also appropriate under section 9.7 of the 2015 Agreement, which provides in relevant part that "[i]f any dispute arises under this Agreement, the venue for such dispute will be in the California Superior Courts and the Federal District Court for the Northern District of California located in San Francisco, California."

## BACKGROUND ON AUDIO ENCODING TECHNOLOGY

18. The rapid advancement in broadband and video distribution technology has created a need for efficient distribution of entertainment content, one part of which is an audio signal. To more efficiently distribute audio signals, service providers encode the audio signals. Simply put, encoding audio signals compresses them, reducing the size of the signals and the amount of space needed to store them on a computer. Service providers use audio encoding to compress audio

signals and then send them to consumer set-top boxes, in which hardware and software use decoding to decompress the audio signals for eventual output to a television or speakers.

19. The hardware in a set-top box typically includes an integrated circuit called a "system on chip" or a "chip." The chip is typically accompanied with firmware, which is a low level computer program that the chip executes. The software is typically a number of higher level computer programs. The computer programs are made up of source code, which is a series of instructions that when compiled into machine code are executed by the chip.

20. As Dolby itself touts, service providers encode audio signals in the adopted industry-standard Dolby Digital format, also called AC-3 because it conforms to the AC-3 standard, as adopted by the ATSC (Advanced Television Systems Committee). Ex. 4. Dolby Digital provides support for surround sound, meaning five audio channels are delivered to multiple speakers both in front of and behind viewers. *Id.* Because Dolby Digital is the adopted industry-standard in the United States, it has no effective competitors in the domestic market.

21. Dolby also offers other forms of more advanced audio encoding, such as Dolby Digital Plus and MS10, a multi-stream decoder. *Id.* Dolby Digital Plus, also called E-AC-3 because it conforms to the E-AC-3 standard, was adopted by the ATSC. Ex. 4. Dolby Digital Plus is a newer product distinct from Dolby Digital. Dolby Digital Plus is not backwards compatible with Dolby Digital, as Dolby Digital decoders are not able to decode Dolby Digital Plus signals. Dolby Digital Plus provides support for up to 7 distinct audio channels.

22. The 2007 Agreement and associated agreements gave Technicolor a license to ███ ███████ Ex. 6 at 1. The 2015 Agreement and associated agreements gave Technicolor a license to ███████████████ Ex. 7 at 2.

**DOLBY LICENSING AGREEMENTS**

23. Dolby and Technicolor have maintained a licensor-licensee relationship for many years related to Dolby's technology, going back at least as far as 1998.

24. On September 17, 2007, Dolby and Technicolor entered into the 2007 Agreement, which granted Technicolor a license to use specified Dolby intellectual property and trademarks. Ex. 1.

5

25. On December 8, 2015, the parties entered into the 2015 Agreement, which granted Technicolor a license to use specified Dolby intellectual property and trademarks. Ex. 2. The 2015 License Agreement currently governs the licensing relationship between Dolby and Technicolor.

26. The 2007 and 2015 License Agreements differ in some respects, but the overall structure of the relationship between Dolby and Technicolor is consistent across both License Agreements.

27. Under the License Agreements, Dolby grants Technicolor a license to use its technology, and in exchange, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

28. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

6



**TECHNICOLOR'S SET-TOP BOX BUSINESS**

40. The majority of Technicolor's Connected Home division revenue comes from the manufacture and sale of television set-top boxes, and Technicolor is a market leader in digital distribution via set-top boxes.

41. In 2018, Technicolor sold approximately 20 million set-top boxes for around 1 Billion Euro. Ex. 8 at ¶ 7.

42. Technicolor is one of only four suppliers of high quality set-top boxes. Ex. 8, ¶ 6. Together, these four suppliers comprise 50% of the market. *Id.* This makes for an extremely competitive marketplace, where competitors attempt to seize every available opportunity to take market share from one another (including Technicolor). *Id.*

43. Dolby's technology, specifically Dolby Digital and Dolby Digital Plus, is the industry standard for home theater and broadcast surround sound, and the vast majority of set-top box customers, Technicolor's included, demand that set-top boxes have Dolby Digital or Dolby Digital Plus. Ex. 8 at ¶ 8; Ex. 4. All digital television broadcasts use Dolby Digital audio in the US and Canada. Ex. 8 at ¶ 8; Ex. 4

44. As a result, over 90% of Technicolor's set-top boxes implement some form of Dolby technology. Ex. 8 at ¶ 9; Ex. 10 at ¶ 15. Technicolor has no feasible alternative technology that the market would accept in place of Dolby technology.

45. Because of its importance in the set-top box market, Technicolor pays more for Dolby technology than for any other technology that it licenses. Ex. 8 at ¶ 11.

**DOLBY'S AUDIT OF TECHNICOLOR**

46. Dolby initiated an audit of Technicolor in February of 2018 pursuant to ████████████████████████████████████████████████████████████████ The 2018 audit covered set-top boxes sold by Technicolor during the period of April 1, 2014 to December 31, 2017.

47. Dolby engaged Connor Group to perform the audit, and Technicolor worked closely with Connor Group throughout 2018. Specifically, Technicolor provided Connor Group with

8

1  detailed spreadsheets that contained information about the number of units sold of each product,
2  including model number, software release notes, the integrated circuit provider, and middleware
3  vendor, among other information. Technicolor provided a multitude of other documents including
4  but not limited to product manuals, product specifications, product user guides, release bulletins,
5  firmware release notes, system on chip configurations, Dolby Design Approval Forms, and
6  STMicroelectronics Silicon Request forms.

7  48. Around June of 2018, Connor Group requested the object code for the firmware from
8  Technicolor. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
9  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Computer programs are written in a
10 human readable format called source code and contain a series of instructions. After a computer
11 program is written in source code, it needs to be compiled into object code for the chip to execute
12 the program. Object code is not human-readable as it is written in a machine code language, such as
13 binary.

14 49. Technicolor responded to Connor that they do not have the object code for the
15 firmware on the audited set-top boxes because it was deleted when Technicolor closed a facility in
16 Indianapolis. In its place, Technicolor provided multiple other forms of documentation describing
17 the implementation of the firmware, including firmware release notes, among other information.

18 50. Technicolor explained to Connor Group that the system on chip manufacturer (e.g.,
19 Broadcom) creates the object code for the firmware. When Technicolor orders a new system on
20 chip from Broadcom, they specify at a high level which features, such as which Dolby technologies,
21 the new chip needs to support. But Technicolor does not actually design the chip, nor does
22 Technicolor have any involvement in creating the object code firmware. In fact, the firmware is
23 supplied to Technicolor by Broadcom in a binary file, meaning it is compiled and not in human
24 readable form. Because the firmware is already compiled when Technicolor receives it, Technicolor
25 does not have the ability to edit or alter the firmware code. Ex. 5 at ¶ 14.

26 51. Even though Technicolor made considerable efforts to determine if it had access to
27 the firmware in object code form, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
28 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

9



53. In August of 2018, Connor Group sent a draft audit report to Technicolor. Technicolor pointed out a number of inaccuracies in the draft audit report and worked with Connor Group to correct those inaccuracies. It continued to work closely with Connor Group regarding the audit findings from September of 2018 to February of 2019.

54. In February of 2019, Connor Group summarized several different issues concerning the audit, including each party's position regarding that issue. The issues included: (1) variances in which Dolby technology was reported for particular products as compared with previous audits; (2) the fact that Technicolor could not provide the object code firmware; (3) a discrepancy between licensed products sold and licensed products reported. Although Technicolor disagreed with a number of the issues identified by Connor, it addressed those issues with a payment in July of 2019 of over $2 million to Dolby. As to the remaining issues, Technicolor met in person with Connor in February and requested additional time to perform analysis and testing of the set-top boxes at issue.

55. In particular, Technicolor's analysis of the Technicolor LH01 set-top box revealed that Technicolor orders and receives a chip, firmware, and some software from Broadcom. Ex. 5 at ¶ 14. According to Broadcom datasheets for their chip in the LH01 product, BCM7362, a generic form of this chip and firmware could potentially support Dolby Digital Plus, if it is configured to do so and properly initialized. Ex. 5 at ¶ 9; Ex. 14 at ¶ 8. As explained above, Technicolor has no

ability to verify this by reviewing Broadcom's firmware code, as Technicolor receives the firmware from Broadcom compiled, or in non-human readable form.

56. Technicolor's investigation revealed that Technicolor requested that Broadcom disable the initialization of the Dolby Digital Plus audio driver in Broadcom's software. Ex. 5 at ¶ 17; *see also* Ex. 14 at ¶ 10-11. Broadcom disabled the initialization of the Dolby Digital Plus audio driver in their software, and confirmed that it was in fact disabled. Ex. 5 at ¶ 17. If the Dolby Digital Plus audio driver is not initialized, that means that the Dolby Digital Plus audio decoder never decodes any Dolby Digital Plus audio streams. Ex. 5 at ¶ 18. Thus, the Firmware never performs Dolby Digital Plus, the chip never performs Dolby Digital Plus, and the LH01 Licensed Product as a whole never performs Dolby Digital Plus. *Id.*

57. Consumers at home do not have the ability to configure, edit, or change the firmware in any way, shape, or form. Ex. 5 at ¶ 22. In addition, consumers also cannot edit the software that comes on the LH01 set-top box. *Id.* Thus, consumers have no way to re-enable the Dolby Digital Plus decoder on the LH01. The only way to change LH01 to support Dolby Digital Plus would be for Broadcom to re-write the source code of their software. *Id.* Then the entire software stack on the LH01 would have to be rebuilt from the bottom up. *Id.* The new software stack would then have to be reloaded onto the LH01. *Id.*

58. Technicolor performed further investigations into other disputed Technicolor products, including C41, C61 and H25, and these investigations also revealed that in these products the Firmware never performs Dolby Digital Plus, the chip never performs Dolby Digital Plus, and the Licensed Product as a whole does not perform Dolby Digital Plus. Ex. 5 at ¶¶ 24-26. Technicolor is continuing to investigate the other disputed products, but simply has not had enough time to complete its analysis of those other products.

59. In addition to the analysis of the products, Technicolor executed, at its own expense and significant engineering work hours, testing on set-top boxes that are at issue to determine which Dolby technologies those set-top boxes actually performed. Ex. 5 at ¶¶ 21, 25. On April 26, 2019 Technicolor reported these test results to Dolby, which supported Technicolor's contention that those set-top boxes, as sold to consumers, only performed the Dolby Technologies for which

Technicolor already paid royalties. The boxes did not perform the additional Dolby Technologies, such as Dolby Digital Plus, that Dolby asserted they performed.

60. Technicolor invited Dolby to come to Technicolor's test facilities to observe the testing, or to test sample set-top boxes themselves. Dolby refused both invitations and rejected Technicolor's test results on May 6, 2019. Instead, Dolby decided to rely on assumptions about Technicolor's products based on *other* set-top boxes *sold by Technicolor's competitors*, and on results from previous audits involving *other* products. Ex. 9 at 3.

61. As shown by Technicolor's analysis and testing, Dolby's assumptions are incorrect: even if similar set-top boxes made by Technicolor's competitors contain a similar chip, the chip may be configured differently in Technicolor's set-top boxes than it is configured in competitor's set-top boxes. In fact, Technicolor deliberately configures the software run by the chip in order to disable certain Dolby technologies. Ex. 5 at ¶ 17. Technicolor's configuration determines which Dolby technologies the firmware, the chip, and the set-top box, will actually perform. Thus, only testing the Technicolor set-top boxes can verify if a particular set-top box supports a specific Dolby audio format, which is exactly what Technicolor did and Dolby refused to do. In short, Dolby ignored the clear analysis and testing evidence that Technicolor provided.

**DOLBY'S NOTICE ALLEGING MATERIAL BREACH**

62. Dolby sent a Notice of Material Breach by letter to Technicolor dated June 19, 2019, alleging that Technicolor materially breached the License Agreements by failing to keep complete books and records (because Technicolor was unable to produce object code firmware) and failing to report or pay for all sales of licensed products (based in large part on Dolby's assumptions using non-Technicolor products). Ex. 9. Dolby concluded the letter by stating that "without full cure of all material breaches set forth herein within thirty (30) days of the date of this letter, Dolby will have the legal right to terminate any and all Agreements between Dolby and Technicolor." *Id.* at 7.

63. Within a week of Dolby's June 19 letter, Dolby began refusing to grant licenses for Technicolor products, bringing an immediate stop to the manufacturing of three set-top box products.

64. In an attempt to appease Dolby, on July 19, 2019, Technicolor wired Dolby $2,134,852 to cure under-paid royalties. Dolby began releasing licenses again after receiving the payment, but the cure payment did not fully satisfy Dolby. Dolby continued to withhold approval of subcontractors to use Dolby technology, which is a necessary part of the manufacturing of Technicolor's set-top boxes.

65. On August 14, 2019, Dolby sent another Notice of Material Breach in a letter attached to an email to Technicolor, repeating its demands. Ex. 3. In the August 14 letter, Dolby threatened to terminate the 2015 Agreement, unless Technicolor pays Dolby an additional $8,051,729 plus interest. Ex. 3 at 2-3.

66. On Sunday, August 25, Technicolor's CEO sent an email to Dolby's CEO, offering to meet in person and attempt to find a business solution to the dispute. As of this writing, Dolby's CEO has not responded. Technicolor also arranged for one of their Directors of Software Engineering to present a technical explanation of why certain Technicolor set-top boxes do not perform Dolby Digital Plus.

67. In addition, Technicolor presented their interpretation of several contractual provisions to Dolby on August 19 and August 28, 2019 and again on September 3, 2019, and asked Dolby for an explanation of their legal position, in an effort to find common ground. Ex. 11. Dolby responded on Friday, September 6 with additional assertions of material breach by Technicolor, and did not modify their threat to terminate the License Agreements on September 10, 2019. Ex. 12.

**DOLBY'S BREACH OF ITS CONTRACTUAL OBLIGATIONS AND TORTIOUS INTERFERENCE WITH TECHNICOLOR'S SET-TOP BOX CONTRACTS**

68. Dolby is breaching its contractual obligations under the License Agreements to grant Technicolor use of the Licensed Technology by threatening to terminate Technicolor's use of the Licensed Technology unless Technicolor pays royalties that it does not owe.

69. Dolby has already breached its contractual obligations under the License Agreements by failing to give Technicolor the required notice and opportunity to cure any alleged under-paid royalties before declaring Technicolor to be in breach and revoking Technicolor's rightful use of the Licensed Technology for certain periods of time in the months of June and July.

70. In short, Dolby promised to grant Technicolor use of the Licensed Technology and an opportunity to cure any under-paid royalties. Dolby has breached the contract by denying Technicolor's lawful license and by denying Technicolor an opportunity to cure.

71. Even though Technicolor disputed Dolby's charges of under-payment, it cured the alleged breach on July 19, 2019, with a payment of $2.1 million to Dolby. Nevertheless, Dolby continues to charge Technicolor with a material breach and to threaten termination of Technicolor's right to use the Licensed Technology.

72. Dolby has made plain that it will terminate the License Agreements on September 10, 2019, unless Technicolor pay the royalties demanded. If that happens, Technicolor's factories will shut down, and Technicolor will miss customer deliveries, irrevocably lose market share to direct competitors, and suffer irreparable harm to its reputation in the industry.

73. Technicolor has contracts with service provider customers, such as DirecTV, to manufacture a certain number of set-top boxes, with certain features, by certain dates. Dolby knows Technicolor has these contracts, because as part of Dolby's recent audit of Technicolor's books and records, Technicolor provided detailed information regarding how many set-top boxes were sold to each service provider. If Dolby terminates the License Agreements, it will shut down Technicolor's factories, which will directly interfere with Technicolor's contracts with its customers, disrupt Technicolor's relationships, and potentially cause Technicolor to breach its contracts.

74. Most, if not all, of Technicolor's customers would look to Technicolor's competitors to receive set-top boxes with Dolby technology if Technicolor is no longer able to implement Dolby technology in its products.

75. If Technicolor loses its right to supply products with Dolby technology, it will lose customers and suffer an immediate loss of market share. Given the importance of Dolby technology in the set-top box market, the loss would be significant, permanently damaging Technicolor's set-top box business.

76. Moreover, Dolby's breach will make it impossible for Technicolor to enlarge its market share without its right to use Dolby technology.

77. Technicolor's reputation as a leader in digital distribution innovation will be lost if it cannot continue to incorporate Dolby technology in its set-top boxes.

78. In addition, if Technicolor cannot use Dolby technology, it will have literally millions of products that it will not be able to sell because Technicolor needs the appropriate licenses from Dolby.

79. Dolby is fully aware of its status as an industry standard, and what a termination would mean for Technicolor. Dolby is threatening Technicolor with the elimination of its set-top box business in an effort to extort royalties that are not owed under the License Agreements.

## COUNT I

## BREACH OF CONTRACT

80. Technicolor incorporates and re-alleges every allegation set forth above, as though fully set forth herein.

81. Dolby entered into valid and enforceable contracts with Technicolor via the 2007 and 2015 License Agreements.

82. The License Agreements require Technicolor to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

83. Dolby is breaching the contract by demanding that Technicolor pay royalties on technology that is not used or performed by Technicolor's Licensed Products, and by refusing to allow Technicolor to use certain Dolby Technology.

84. Dolby is also contractually obligated to give Technicolor written notice and 15 days to pay any alleged under-paid royalties.

85. Dolby breached the 2015 License Agreement by not allowing Technicolor 15 days to pay the alleged under-payment before Dolby declared a breach and withheld licenses from Technicolor.

86. Dolby was contractually obligated to give Technicolor written notice and 30 days to cure any alleged breach of the License Agreements.

87. Dolby breached the License Agreements by not allowing Technicolor 30 days to cure before Dolby declared a breach and withheld licenses from Technicolor.

88. Dolby's breaches of the License Agreements constitute material breaches of contract.

89. As a result of these contractual breaches, Technicolor has been injured, and is otherwise threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image—indeed, the potential loss of its entire set-top box business.

90. Technicolor has suffered damages, and will suffer further damage and irreparable harm, by reason of each and all of the acts, practices, breaches, and conduct of Dolby alleged above until and unless the Court enjoins such acts, practices, and conduct.

## COUNT II

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

91. Technicolor incorporates and re-alleges every allegation set forth above, as though fully set forth herein.

92. Dolby breached its duty to perform and enforce the License Agreements fairly and in good faith by demanding Technicolor provide it with firmware records that it does not have ████ ████████████████████████████ and by using its market position to demand that Technicolor pay royalties on Licensed Technologies that are not used or performed in Technicolor's set-top boxes on threat of termination of the Agreements.

93. Dolby breached its duty not to do anything to injure Technicolor's right to receive the benefits of the License Agreements when it gave Technicolor no opportunity to cure any alleged under-payment or breach before immediately interfering with Technicolor's right to use the Licensed Technology.

94. Dolby's breaches of the implied covenant of good faith and fair dealing constitute material breaches of the License Agreements.

95. As a result of its breach of the implied covenant, Technicolor has been injured, and is otherwise threatened by imminent loss of profits, loss of customers and potential customers, loss of goodwill and product image, and the loss of its entire set-top box business.

96. Technicolor has suffered damages, and will suffer further damage and irreparable harm, by reason of each and all of the acts, practices, breaches, and conduct of Dolby alleged above until and unless the Court enjoins such acts, practices, and conduct.

## COUNT III

**TORTIOUS INTERFERENCE WITH THE PERFORMANCE OF CONTRACTS**

97. Technicolor incorporates and re-alleges every allegation set forth above, as though fully set forth herein.

98. Technicolor entered into valid and enforceable contracts with service providers to manufacture set-top boxes for those service providers.

99. Dolby has knowledge of these contracts between Technicolor and service providers, at least because, as part of Dolby's recent audit of Technicolor's books and records, Dolby knows how many set-top boxes were sold to each service provider.

100. Dolby is intentionally and unjustifiably interfering with these contracts with service providers by refusing to grant subcontractor approvals, refusing to grant license extensions, and refusing to allow Technicolor to use certain Dolby Technology.

101. Dolby's acts, including the refusal to grant licenses to Dolby Technology, were designed to interfere with Technicolor's contracts with service providers, in order to extract additional royalties from Technicolor.

102. Dolby has actually interfered and disrupted Technicolor's relationships with service providers by delaying approval of licenses and subcontractors, and by threatening to terminate the contract.

103. As a result of this interference, Technicolor has been injured, and is otherwise threatened by breach of contract with service providers and related contractual damages.

104. Technicolor has suffered damages, and will suffer further damage and irreparable harm, by reason of each and all of the acts, practices, breaches, and conduct of Dolby alleged above until and unless the Court enjoins such acts, practices, and conduct.

**PRAYER FOR RELIEF**

Technicolor respectfully requests:

1. That the Court declare that Technicolor is required to pay for royalties only for Licensed Technology that its Licensed Products actually perform.

2. That the Court enter judgment that Dolby is liable for breach of contract and the duty of good faith and fair dealing.

3. That the Court enter judgement that Dolby is liable for tortuously interfering with the performance of Technicolor's contracts with service providers to manufacture set-top boxes;

4. That the Court preliminarily and permanently enjoin Dolby from interfering with Technicolor's rightful use of the Licensed Technology.

5. That the Court award Technicolor its treble damages, costs, attorneys' fees, and litigation expenses incurred in this action under any applicable basis.

6. That the Court award Technicolor any other relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Technicolor hereby demands a trial by jury for all issues so triable that are raised herein or which hereinafter may be raised in this action.

Dated: September 9, 2019

Respectfully submitted,
/s/ Lucas J. Tomsich
LUCAS J. TOMSICH Cal. Bar No. 295685
FAEGRE BAKER DANIELS LLP
1950 UNIVERSITY AVE, Suite 450
East Palo Alto, CA 94303-2279
Telephone: 650.324.6700
Facsimile: 650.324.6701
Email: lucas.tomsich@FaegreBD.com

BRIAN J. PAUL (*pro hac vice* pending)
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46024-1750
Telephone: (317)-237-0300
Facsimile: (317)-237-1100
Email: brian.paul@FaegreBD.com

JOSHUA N. TURNER (*pro hac vice* pending)
FAEGRE BAKER DANIELS LLP
90 S. Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7738
Facsimile: (612) 766-1600
Email: joshua.turner@FaegreBD.com

*Counsel for Plaintiff Technicolor, SA*

**VERIFICATION**

I, Thomas Bohan, am the Lead Negotiator for Licensing-In at Technicolor Connected Home, a division of Technicolor, SA, and am authorized to provide verification of Technicolor SA's complaint. Some of the information and facts within the complaint are not within my personal knowledge. Such information has been assembled by authorized employees and/or counsel of Technicolor who have informed me that the information and facts are true and accurate. Therefore, I declare under penalty of perjury and verify the foregoing **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND DAMAGES** as true and accurate.

Executed on this 9th day of September, 2019.

_____
Thomas Bohan

Document1